## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| The Paw, Inc., on behalf of itself and all others similarly situated, | Case No: |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | |
| FieldTurf USA, Inc.; FieldTurf, Inc.; and FieldTurf Tarkett SAS, | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff The Paw, Inc., ("Plaintiff"), individually and on behalf of a class of all others similarly situated, files this Class Action Complaint against Defendant FieldTurf USA, Inc.; FieldTurf, Inc.; FieldTurf Tarkett SAS; (collectively, "FieldTurf" or "Defendants"), and state the following:

## I.    INTRODUCTION

1.    This is a class action on behalf of purchasers of defective artificial turf fields, among them private companies, school districts, colleges and universities, park departments, and other local governmental entities throughout the United States.  These purchasers challenge Defendants' fraudulent and misleading marketing, sales, and warranty practices relating to their defective Synthetic Turf Fields sold under the brand names "FieldTurf," "DuraSpine," and "Prestige" (collectively "Synthetic Turf Fields").

2.    On or about December 4, 2016, NJ Advance Media published comprehensive findings following a six month investigation of Defendants' business

practices, which concluded that Defendants knowingly and actively concealed defects found in the Synthetic Turf Fields they sold to unwitting purchasers.[1]

3.      According to NJ Advance Media's investigation, from 2005 to 2012, Defendants sold Synthetic Turf Fields to various public and private entities based on representations that their supposedly technologically superior monofilament "Evolution" fiber fields outlasted traditional tape filament fields and had unmatched durability.

4.      Defendants marketed these Synthetic Turf Fields as having special characteristics, such as being far more resistant to ultraviolet ("UV") radiation and foot traffic than tape filament fields.  Defendants claimed that these qualities made their Synthetic Turf Fields last longer than competitors' fields and were therefore a better value to consumers.  Defendants warranted these Synthetic Turf Fields for eight years, but asserted the fields were designed to last even longer than that.

5.      Upon information and belief, Defendants became aware as early as October 2006 that their Synthetic Turf Fields were defective and showed signs of cracking, splitting, and disintegrating far earlier than what their sales pitches and representations had promised.  Tests conducted at The University of Michigan's Breaker Space Lab at the request of NJ Advance Media confirmed that the tensile strength of Defendants' Synthetic Turf Field fibers were substantially lower than what was promised in Defendants' marketing campaigns.

---

[1] *See The 100-Yard Deception*, NJ ADVANCE MEDIA, https://readymag.com/njdotcom/fieldturf (last visited January 4, 2017).

6.     Upon information and belief, an internal FieldTurf investigation concluded that the synthetic grass blades' chemical composition had been altered, which resulted in inadequate UV protection and caused premature wear, deterioration, and matting in Defendants' Synthetic Turf Fields.

7.     Defendants subsequently sued their turf materials supplier.  Despite knowing that their Synthetic Turf Fields were defectively manufactured, Defendants continued to tout their Synthetic Turf Fields as they always had and actively concealed their defective nature from current and potential consumers.  Defendants continued to sell the defective Synthetic Turf Fields until the product line was discontinued in 2012.

8.     Purchasers made numerous complaints that their Synthetic Turf Fields were prematurely deteriorating, splitting, and matting.  Nevertheless, Defendants refused to change their marketing campaign, continued touting their Synthetic Turf Fields as "the most durable and longest-lasting synthetic turf system in the marketplace," and stonewalled consumers who complained by blaming the premature deterioration on poor or improper maintenance, or by claiming the turf looked like it was supposed to look, among other things, instead of informing consumers of the defects and honoring their warranties in full.

9.     Defendants ultimately sold over 1,400 Synthetic Turf Fields to businesses, municipalities, schools, and other institutions throughout the United States between 2005 and 2012.  The average cost of each field was between $300,000 and $500,000, and Defendants profited an estimated $512 million from the sale and installation of these Synthetic Turf Fields across the country.

10.    As a result of Defendants' misconduct, described herein, Plaintiff brings this class action to recover damages and all other relief allowed by law, on behalf of itself and all others similarly situated.

## II.    PARTIES

11.    Plaintiff The Paw, Inc., is a Minnesota corporation, with its principal place of business located at 1741 Premier Drive, Mankato, MN 56001.  Plaintiff purchased a defective Synthetic Turf Field from Defendants in 2007 for its pet resort business based upon Defendants' promises that, among other things, the synthetic grass blades would stand up like natural grass and not succumb to matting in heavily used areas of their facility.    Within six months of installation, Plaintiff noticed visible matting of its Synthetic Turf Field and notified Defendants' agent and licensed FieldTurf installer about the problem.  Defendants' agent told Plaintiff that it lacked the proper machinery to care for and maintain his Synthetic Turf Field, and sold it costly equipment that would supposedly help.  At no time did Defendants ever tell Plaintiff that its Synthetic Turf Field was defective.

12.    Defendant FieldTurf USA Inc. is a Florida corporation with its principal place of business located at 75 North Industrial Blvd., N.E., Calhoun, Georgia 30701.  FieldTurf USA markets and sells defective Synthetic Turf Fields in Minnesota and throughout the United States.

13.    Defendant FieldTurf, Inc. is a Canadian corporation with its principal place of business located at 8088 Montview Road, Montreal, Quebec, H4P 2L7.

14.     Defendant FieldTurf Tarkett SAS is a French corporation with its principal place of business located at 2 Rue de l'Egalite, 92748 Nanterre Cedex, France.  FieldTurf USA is a subsidiary of FieldTurf Tarkett.

## III.     JURISDICTION AND VENUE

15.     This Court has original jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.).

16.     The amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there are at least one hundred members of the putative class, many of which are citizens of a different state than Defendants.  Defendant FieldTurf USA is a citizen of Florida, where it is incorporated, and Georgia, where its principal place of business is located; Defendants FieldTurf, Inc., and FieldTurf Tarkett are foreign corporations who transact business in the United States.

17.     This Court has personal jurisdiction over Defendants because they conduct business in this District and have sufficient minimum contacts in this District. Defendants intentionally avail themselves of this jurisdiction by transacting business and deriving substantial revenues from business activity in this District.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants' contacts with the District are sufficient to subject Defendants to personal jurisdiction in this Court.  Venue is also proper here because a substantial portion of the practices complained of herein occurred in this District and harm occurred to class

members residing in Minnesota, including to Plaintiff, who is a Minnesota resident that purchased one of Defendants' defective products in the State of Minnesota.

## IV.    FACTUAL ALLEGATIONS

### A.    Synthetic Turf Fields

19.    Traditionally, synthetic grass fibers were made with tape filament often referred to as "slit film."  Slit film is produced as a sheet of plastic, or film, that is slit into individual grass blades and then bunched and sewn into a carpet backing to create artificial turf fields.

20.    The lifetime of these traditional slit film fields was limited by exposure to the sun's UV radiation, which damages and breaks down plastics over time.

21.    In 1995, Defendants began selling a patented synthetic turf field that "infilled" slit film grass with sand and rubber crumbs, making it softer and more shock absorbent than competitors' turfs.

22.    By 2003, Mattex Leisure Industries ("Mattex") had developed a new synthetic grass fiber known as "Evolution."  Rather than being cut from a sheet like slit film, Evolution was produced as a monofilament, which was made by pushing individual strands through an extruder.  These individual strands came with a central "spine" running down the middle of each blade of grass, which purportedly made it more durable than slit film and looked more like natural grass.

23.    By including a spine on each individual blade of grass, Evolution fibers were also claimed to be better able to "stand up" like natural grass after repeated usage,

6

and its proprietary chemical composition supposedly withstood the damaging effects of the sun's UV radiation better than anything else on the market.

24.     Tests conducted by FieldTurf and Mattex supposedly led FieldTurf to conclude that Evolution fibers could be marketed as more resistant to wear and tear and better able to withstand the sun's UV radiation than any other product on the market.

25.     In 2004, FieldTurf and Mattex negotiated an exclusive supply agreement for Evolution fibers, which was extended on an annual basis through 2007.

26.     In 2007, TenCate Thiolon Middle East LLC ("TenCate") acquired Mattex, and in 2008, FieldTurf and TenCate negotiated a supply agreement which extended Evolution's exclusive supply agreement through December 31, 2011.

27.     From 2005-2012, Defendants marketed, sold, and installed Synthetic Turf Fields with Evolution fibers under the brand names "FieldTurf," "DuraSpine" and "Prestige."  Defendants ultimately sold over 1,400 Synthetic Turf Fields to unknowing purchasers, including numerous school districts throughout the nation, without informing them that the Evolution fibers had less UV protection than was advertised and resulted in the grass fibers laying down and matting well before the warranty period expired.

**B.     Defendants Marketed Their Synthetic Turf Fields as the Best Money Could buy**

28.     Between 2005 and 2012, Defendants marketed, sold, and warrantied their Synthetic Turf Fields throughout the United States.

29.     The average price for one of Defendants' Synthetic Turf Fields was between $300,000 and $500,000.  Defendants promised that although "the upfront cost is

higher," it was "a much more financially-sound decision" than natural grass. *Cost Analysis*, FIELDTURF, http://www.fieldturf.com/es/fieldturf-difference/cost-analysis (last visited January 4, 2017). Defendants justified this higher cost by promising consumers their Synthetic Turf Fields were the most durable product on the market, had an expected useable life of more than ten years, and was more cost effective than maintaining real grass. They claimed this enabled purchasers to "amortize the life of the field on a 10+ year basis rather than the 8+ year life expectancy" and was used as a basis for justifying the higher price, which was approximately $85,000 more than a natural grass field. *Id.*

30.  Compared to the costs associated with maintenance and equipment needed to upkeep natural grass, Defendants claimed that consumers of their Synthetic Turf Fields would save $25,000 to $50,000 per field, per year. *See Fig. 1.*

31.  Defendants further claimed that the length of time for which their Synthetic Turf Fields could be used was "just about unlimited, with stable long-term performance levels and limited maintenance as compared with natural grass." *Id.*



Fig. 1: Advertising materials sent to prospective FieldTurf clients



### 10 Reasons Why FieldTurf And Its MonoGrass System Should be Selected

#### 1. MONOFILAMENT FIBERS—DURABILITY AND VALUE

In the last few years, FieldTurf has focused on new products that have all the best attributes of traditional PB slit film yarns, with the added *durability* that is only possible with the monofilament production process. FieldTurf's efforts have resulted in a patented fiber unavailable to any other company.

FieldTurf's new "DuraSpine" MONOFILAMENT fiber offers INCREASED PRODUCT LIFE. Comparative wear testing shows a wide gap in wear resistance between standard, proven slit film fibers (including FieldTurf's own slit film, which has a proven 8-10 year life cycle) and this new generation of "true" monofilament. Although at this point it is impossible to correlate this additional toughness to a set period of extended product life, the fact remains that the new FieldTurf system will last longer.

*And the longer a product lasts, the more economical it is from a life cycle standpoint! Buying FieldTurf with the new MONOFILAMENT, regardless of initial price, is a BETTER VALUE.*

This added longevity will actually allow the District to amortize the life of the field on a 10+ year basis rather than the 8+ year life expectancy. This represents a much greater return on investment than the older slit film products currently being installed by most companies in the market. FieldTurf has in place over 40 MONOFILAMENT applications in North America, including fields at the NCAA Division I level. No other company has this kind of fiber or such proven fields in place.

#### 2. MONOFILAMENT FIBERS—PLAYABILITY AND AESTHETICS

FieldTurf's new-generation monofilament system is the closest thing yet to a grass-like surface.

- The fibers have excellent "memory" so they remain looking like new grass—erect fibers, not a matted carpet.
- The erect fibers offer "resistance" to soccer balls, making the system more grass-like—the ball rolls and plays exactly like it does on grass according to FIFA testing--and thus is more useful for soccer players.
- The fibers, though more durable, are quite soft, which will virtually eliminate skin abrasions.

Fig. 2: Advertising materials used by Defendants

32.     Defendants also touted its "patented fiber unavailable to any other company" as having "unmatched durability" and was "far more resistant to UV and foot traffic." *See The 100-Yard Deception*, NJ ADVANCE MEDIA, https://readymag.com/njdotcom/fieldturf/6/ (last visited January 4, 2017).

33.     Defendants made representations in industry publications and in marketing pitches that their Synthetic Turf Fields had a useful lifespan of ten years or more, and stated that they had "excellent memory" which would remain standing up and looking like natural grass instead of matting down, even after repeated usage.

9

The DuraSpine monofilament fiber is based on similar structures found in nature. The arched profile features a durable "spine" which runs vertically through the center of each fiber. Like the center stem or vein on a blade of grass, this spine gives each fiber unmatched "memory" and thus resistance to matting. This system also enhances ball-roll properties, bio-mechanics and aesthetics.

DuraSpine is extruded through a spinneret, and as a "true" monofilament fiber - not a flimsy slit tape like competing systems - delivers unmatched durability, especially resistance to wear. Tests indicate the DuraSpine fiber is far more resistant to UV and foot traffic, the two main enemies of any turf system. Unlike some new fibers on the market, DuraSpine is not abrasive to players but is silky and lush just like nature intended.

The DuraSpine Monofilament Turf System is available in a monotone or duotone green. FieldTurf can also produce DuraSpine in custom colors to match any endzone or logo requirements. The fiber may be new,

Fig. 3: Advertising materials used by Defendants

34.     Defendants marketed their Synthetic Turf fibers' monofilament construction as a "breakthrough in technology" that was made of the most durable and high quality materials, and claimed that it would provide strong wear resistance to foot traffic and UV radiation.

35.     Defendants also claimed that their Synthetic Turf fibers "can be played on in all weather conditions, from the ice of the Arctic to the heat of the Equator. Neither rain, nor snow, nor heat affect Prestige's consistent performance."

36.     Defendants stated that their manufacturing process was carefully controlled and their "ongoing policies ensure only the highest quality, approved materials from [their] suppliers" would be used in making their Synthetic Turf Fields.

**Versatile and Adaptable**

Monofilament is a significant technological advance, according to FieldTurf Tarkett CEO John Gilman. "We believe it will change the industry as much as the original material did," he says. "For one thing, it will double the expected useful life of the installation because the individual fibers used in the mono surface are both stronger and more chemically uniform than those used in the traditional product. That means they wear more slowly and can be formulated to resist environmental agents, like ozone, which attack polymer materials."

Mono is an important new product, Gilman explains: "It's a breakthrough in technology every bit as important as the original surface was," he says. "Mono is the result of a lot of hard work in collaboration with our material suppliers to develop a product and a process that significantly improves the properties of the playing surface."

The shape of the monofilament fiber is based on similar structures found in nature. The arched profile features a durable "spine," which runs vertically through the center of each fiber. The fiber is extruded through a spinneret and is a "true" monofilament fiber, not a flimsy slit tape like competing systems.

> "We anticipate that a mono surface will have a useful life longer than the 10 years we expect from a tape filament surface. We have also developed a patented process that causes some of the filaments in the mono surface to lie over while others stand straight up." – John Gilman, CEO, FieldTurf Tarkett

The yarn is also much stronger than the tape filaments. "So the surface will last longer, all things being equal," says Gilman. "We anticipate that a FieldTurf mono surface will have a useful life longer than the 10 years we expect from a tape filament surface. We have also developed a patented process that causes some of the filaments in the mono surface to lie over while others stand straight up. This helps keep the infill material in place much better than the first generation materials. Even the 'splash' from a bouncing soccer ball is completely encapsulated on a FieldTurf Duofilament field."

Fig. 4: Advertising materials used by Defendants

37.     Defendants claimed that by placing UV inhibitors in the polyethylene mix during the manufacturing stage, their fibers would "provide twice the resistance to ultraviolet rays as that of other fibers," thereby making it more resistant to foot traffic. *See Fig. 5.*

11



Fig. 5: Advertising materials sent to prospective FieldTurf consumers

38.     Defendants provided customers who purchased their Synthetic Turf Fields with an 8 year warranty for repair or replacement of any defective materials or workmanship that resulted in premature turf wear, at no cost to the customer.



Fig. 6: A sample FieldTurf manufacturer's limited warranty

39.     Many of Defendants' customers included private businesses, school districts, colleges and universities, municipalities and other municipal entities.  From 2005 to 2012, Defendants installed over 1,400 Synthetic Turf Fields in the United States and generated an estimated $512 million in profits.

## C.     Defendants Knew Their Synthetic Turf Fields Were Defective

40.     As revealed by the NJ Advance Media investigation, candid and detailed internal email discussions show Defendants were aware as early as 2006 that their

Synthetic Turf Fields did not, and could not, perform as marketed, sold, and warranted. This evidence includes:

    a.    Internal email discussions in 2006 concerning observable wear and matting on South American DuraSpine fields that were less than one year old, which alerted Defendants to the fact that their Synthetic Turf Fields were prematurely deteriorating, splitting, and matting;

    b.    Defendants suspected that Mattex had changed the chemical composition of the Synthetic Turf Field's fiber, which made it less resilient than Defendants advertised;

    c.    Internal documents from Defendant's CEO showed that Defendants feared warranty claims could be upwards of $35 million should more of their Synthetic Turf Fields fail (See Exhibit 1; obtained from https://readymag.com/njdotcom/fieldturf/8/);

    d.    Internal email discussions from FieldTurf Executive Director Ken Gilman to other FieldTurf executives discussed DuraSpine not being nearly as resilient as initially thought, and that FieldTurf's overblown marketing claims and sales pitches should be changed to reflect that reality.



Fig. 7: A 2007 Email from FieldTurf Executive Director Ken Gilman
concerning FieldTurf's marketing campaign. Obtained from
https://readymag.com/njdotcom/fieldturf/12/

e.    After a 2007 visit to fields installed in New Jersey, emails among FieldTurf

executives discussed white Synthetic Turf Field fibers "deteriorate[ing] at

an alarming rate" and "fibrillat[ing] in just its second year" of use, which

led at least one FieldTurf executive to state that, in comparison to slit film,

"the advantages of monofilament (have) been exaggerated;" and

f.    Internal emails throughout 2007 and 2008 showed Ken Gilman

unsuccessfully pleaded with FieldTurf's CEO to reign in sales and

marketing claims "that [FieldTurf] can't possibly meet in the real world"

due to the fact that "DuraSpine is not all that it's cracked up to be

especially in terms of wear resistance."

**D.    Defendants Were Involved in Numerous Lawsuits Regarding Their Synthetic Turf Field's Quality yet Never Informed Customers of the Defects**

41.    Before any Synthetic Turf Field warranties expired, Defendants received

numerous complaints of premature deterioration and matting on their Synthetic Turf

Fields.

42.    In response, FieldTurf visited various fields and noted that, regardless of the location, their Synthetic Turf Fields showed consistent deterioration, wear, and matting.

43.    As a result of its clear knowledge and understanding of the prematurely deteriorating fields, FieldTurf sued its turf supplier, TenCate, in 2011. *See FieldTurf USA, Inc. et al v. TenCate Thiolon Middle East, LLC*, No. 4:11-CV-50-TWT (D. Ga. March 1, 2011) ("TenCate Lawsuit"). FieldTurf's complaint alleged that TenCate changed Evolution's chemical composition, which rendered the fiber "less durable" and caused "premature disintegration during the warranty period." FieldTurf provided expert testing results to attempt to prove its allegations.

44.    FieldTurf's CEO Eric Daliere testified in the TenCate Lawsuit that although FieldTurf believed Evolution's monofilament was defective, Defendants continued to replace warrantied—and supply Synthetic Turf Fields to new consumers—with the very same fibers they alleged were defective. Daliere further stated that they had not informed their clients that they believed the fibers were defective. See Exhibit 2.

45.    Despite numerous internal email discussions confirming their knowledge, the TenCate Lawsuit and numerous complaints from customers, Defendants continued to market, manufacture, and sell defective Synthetic Turf Fields to consumers throughout the country without informing them that their products were defective.

## E.    Defendants Continued to Conceal the Defects From Purchasers

46.    Rather than informing consumers that they had purchased a defective product, Defendants continued to actively conceal the fact that their Synthetic Turf Fields

were deteriorating faster than expected.  It was not until NJ Advance Media published its findings in December 2016, following a six-month long investigation into the failing Synthetic Turf Fields, that their deceptive and fraudulent business practices came to light.

47.    According to the NJ Advance Media report, a 2007 email discussion caught the attention of Defendants' attorney, who informed Defendants that "this email thread contains information that could be used against [FieldTurf] in a lawsuit as it is 'discoverable.'"  This led FieldTurf Executive Director Ken Gilman to query whether FieldTurf could "somehow get [the email communications] zapped off?" in order to avoid discoverability.  FieldTurf IT consultant Tony Illig informed Ken Gilman that the emails were likely in too many places to be wiped clean, and that "legally, it is not possible . . . .  You would be asking me . . . to commit a possible crime."

48.    In a 2014 court testimony, FieldTurf Executive Director Ken Gilman testified that there was "a constant problem of our sales and marketing people overpromising certain aspects of the FieldTurf system."

49.    Despite these ongoing problems, Defendants never altered their marketing campaign or sales pitches because, in the words of FieldTurf marketing director Darren Gill, he "wasn't asked to change them."

50.    Defendants continued to conceal the defect from complaining customers by claiming that the Synthetic Turf Fields looked just as they should, or that any complaints about premature failure of the Synthetic Turf Fields were due to improper maintenance, despite knowing the product was, in reality, defective.

51.     Defendants concede that nearly one of every five DuraSpine fields in the United States have been replaced under warranty.  Upon information and belief, the remaining fields have yet to be replaced, despite all or nearly all of the fields installed by Defendants between 2005 and 2012 being subject to the same defects that lead to premature deterioration and failure.

52.     Despite their knowledge of the defects, Defendants never changed their marketing campaign for their Synthetic Turf Fields and continued to assert that "FieldTurf has proven to be the most durable and longest-lasting synthetic turf system in the marketplace."

53.     Upon information and belief, Defendants have yet to contact consumers to inform them of the defect in their Synthetic Turf Fields.

**F.     Plaintiff Purchased a Defective Synthetic Turf Field from Defendants**

54.     Plaintiff The Paw, Inc. is one of many unfortunate purchasers of a defective Synthetic Turf Field from Defendants.  Plaintiff is a pet care provider in Mankato, Minnesota, where individuals can bring their pets for daily activities, boarding services, or grooming needs.  Due to the high volume of pet traffic Plaintiff experiences on an annual basis, having durable outdoor fields that would not wear down and would continually stand up like natural grass was a high priority.

55.     After examining the options on the market, Plaintiff narrowed it down to two choices, including Defendants.  As part of the process, Plaintiff had multiple discussions with Defendants' sales representative for the area.

56.     Unbeknownst to Plaintiff, Defendants' sales representative engaged in the same grandiose and misleading sales tactics that was systematically employed by FieldTurf sales representatives across the country.    During their discussions, the representative gave Plaintiff sales pitches and information as to why FieldTurf was the best option.  The representative noted that Defendants' Synthetic Turf Fields were widely used on football fields, including those used by the New England Patriots and Nebraska Cornhuskers, and even claimed that Defendants' synthetic turf, if installed at a pet facility, would not wear out due to the fact that dogs, rather than large football players, would be using the Synthetic Turf Field.  The representative also represented that the field would easily last without any matting or grass lying down.

57.     Among the promises Defendants made to Plaintiff were:

a.     the costs associated with maintenance and equipment needed to upkeep natural grass would save $25,000 to $50,000 per field, per year;

b.     the length of time for which the Synthetic Turf Fields could be used was "just about unlimited, with stable long-term performance levels and limited maintenance as compared with natural grass;"

c.     defendants' Synthetic Turf Fields had "unmatched durability" and provided "twice the resistance to ultraviolet rays as that of other fibers;"

d.     that the Synthetic Turf Fields possessed "unmatched memory and resistance to matting;"

18

e.   that the Synthetic Turf Fields "can be played on in all weather conditions, from the ice of the Arctic to the heat of the Equator.  Neither rain, nor snow, nor heat affect Prestige's consistent performance;" and

f.   that Defendants' manufacturing process was carefully controlled to "ensure only the highest quality, approved materials from [their] suppliers" would be used in making their Synthetic Turf Fields.

58.   On November 15, 2007, Plaintiff relied on FieldTurf's representations and chose to install Defendants' Prestige XM50 Synthetic Turf Field.

59.   Plaintiff's field was installed by Defendants' licensed FieldTurf installer and agent, Midwest FieldTurf.

60.   Once the sale was completed, Plaintiff never heard from his FieldTurf sales representative again.

61.   Plaintiff paid approximately $127,000 for the purchase and installation of its Synthetic Turf Field.

62.   As a licensed FieldTurf distributor, Midwest FieldTurf "prides itself in staying consistent with the quality standards set forth by the FieldTurf brand." MIDWEST FIELDTURF, http://www.midwestfieldturf.com (last visited January 4, 2017).

63.   Midwest FieldTurf's website utilizes the same FieldTurf logo as Defendants' logo, has numerous links to Defendants' website, and even has a maintenance webpage where, among other things, one of their services is to "[p]hoto . . . possible warranty work for submission to turf manufacturer." Midwest FieldTurf, http://midwestfieldturf.com/maintenance.asp (last visited January 4, 2017).

64.    Within six months of installation, Plaintiff began to notice an unusual appearance on the Synthetic Turf Field where the animals walked around.  Rather than having the grass stand up as advertised, the blades of grass were starting to lie down and show signs of matting.

65.    Plaintiff contacted Midwest FieldTurf and notified Defendants of the poor quality of the installed turf.  In response, Midwest FieldTurf told Plaintiff that in order to have the grass stand up as desired, he would need to purchase a special broom for $700.00 to properly maintain his field.  Midwest FieldTurf did not reveal to Plaintiff that the Synthetic Turf Field it purchased was defective, but merely suggested Plaintiff was not properly maintaining it.

66.    Plaintiff purchased the broom as instructed, but had no success in getting the grass to stand up as had been promised.  To date, Plaintiff has never been informed by Defendants of the defective nature of his Synthetic Turf Fields.  At all times, Defendants took the position that Plaintiff's field experienced deterioration and matting because Plaintiff failed to adequately clean and maintain the field.

67.    In 2010, Plaintiff again called Midwest FieldTurf to notify them that it did not believe the turf looked as it was supposed to look.  Instead of informing Plaintiff that the field was defective and would have to be repaired or replaced, Midwest FieldTurf recommended a site visit with a large, heavy-duty "rake" machine to improve the turf's performance and appearance.  Midwest FieldTurf charged Plaintiff $1,400 for the work.

68.    Even requiring Plaintiff to pay it to inspect, decompact, clean, and refinish Plaintiff's Synthetic Turf Field, Defendants' turf still did not stand up.  Again, Midwest

FieldTurf did not acknowledge any issues, did not engage in any warranty discussions or take any photos for purposes of possible warranty claims, nor did they reveal that Plaintiff had purchased a defective Synthetic Turf Field. Rather, FieldTurf told Plaintiff that the turf looked exactly as it was supposed to, that it "looked fine" and that "your playground looks perfect." Plaintiff, not being in the artificial turf industry, took Defendants at their word. These were the same types of statements Defendants made to other Class members to falsely divert any investigations into the quality of the fields.

69.    Because of Defendants' misrepresentations that with proper maintenance and care the Synthetic Turf Field would last through the warranty period, and that the field was performing as it should, Plaintiff relied on those representations.

70.    Defendants' misleading and stonewalling tactics hid the true nature of their Synthetic Turf Fields from Plaintiff. Rather than disclosing the defective nature of the material to Plaintiff, they attempted to shift the burden of maintaining a fundamentally defective Synthetic Turf Field onto Plaintiff despite knowing that nothing could be done to adequately keep the fields from matting and prematurely deteriorating.

71.    It was not until shortly after the NJ Advance Media investigative report became public that Plaintiff learned of the defective nature of his Synthetic Turf Field.

## V.    CLASS ACTION ALLEGATIONS

72.    Plaintiff brings this action on behalf of itself and as a class action, pursuant to the provisions of Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (the "Class"):

All purchasers, nationwide, who purchased a Synthetic Turf Field from Defendants or their affiliates, entities, or subsidiaries between 2005 and 2012.

73.    Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

74.    Certification of Plaintiffs' claims for Class-wide treatment is appropriate because all elements of Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) are satisfied. Plaintiffs can prove the elements of their claims on a Class-wide basis using the same evidence as would be used to prove those elements in an individual action alleging the same claims.

75.    **Numerosity:** All requirements of Fed. R. Civ. P. 23(a)(1) are satisfied. Members of the Class are so numerous and geographically dispersed that the individual joinder of all absent Class is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, based upon the nature of the trade and commerce involved, the proposed Class likely includes over one thousand members.

76.    **Commonality and Predominance:** All requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) are satisfied. Common questions of law and fact exist as to all Class Members. These questions predominate over any questions unique to any individual Class Member and include, without limitation:

   a.    Whether Defendants falsely marketed and sold their Synthetic Turf Fields to Plaintiff and members of the proposed Class;

   b.    Whether Defendants' Synthetic Turf Fields were, in fact, defective;

   c.    Whether Defendants made express warranties to Plaintiff and members of the Class;

    d.      Whether Defendants honored their warranties to Plaintiff and members of the Class;

    e.      Whether Defendants' conduct violated the proscriptions of the consumer protection statutes enumerated herein;

    f.      Whether Defendants fraudulently concealed their misconduct;

    g.      Whether Defendants made false representations about the quality of their product;

    h.      Whether Plaintiff and the members of the proposed Class are entitled to damages;

    i.      Whether Plaintiff and the members of the proposed Class are entitled to equitable relief; and

    j.      Whether Plaintiff and the members of the proposed Class are entitled to other relief under law.

77.    **Typicality:** All requirements of Fed. R. Civ. P. 23(a)(3) are satisfied. Plaintiffs' claims are typical of the claims of the Class. Defendant's actions have affected Class Members equally because those actions were directed at Plaintiffs and Class Members and affected each in the same manner. Accordingly, Plaintiffs' claims against Defendant based on the conduct alleged in this Complaint are identical to the claims of other Class Members.

78.    **Adequacy of Representation:** All requirements of Fed. R. Civ. P. 23(a)(4) are satisfied. Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiff is a Class Member and has no interests adverse to the interests of the members of

the Class.  Plaintiffs are committed to prosecuting this action to a final resolution and have retained competent counsel who have extensive experience in prosecuting complex class action litigation and who will vigorously pursue this litigation on behalf of the Class.

79.  **Predominance and Superiority:** All requirements of Fed. R. Civ. P. 23(b)(3) are satisfied.  As described above, common issues of law or fact predominate over individual issues.  Resolution of those common issues in Plaintiff's individual case will also resolve them for the Class's claims.  In addition, a class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by the Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for members of the Class to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## VI.    TOLLING OF STATUTES OF LIMITATION

80.    As alleged herein, any applicable statutes of limitations have been tolled by Defendants' fraudulent concealment and inequitable conduct.  Defendants engaged in affirmative acts to conceal the existence of material defects in their Synthetic Turf Fields, which Plaintiffs reasonably relied upon.  Moreover, Plaintiff exercised reasonable diligence in attempting to discover the defects in its Synthetic Turf Field.  It was not until after the truth was finally exposed by an investigative journalism piece published in December 2016 that Plaintiff could have been reasonably expected to know of Defendants' fraud.

81.    In an attempt to hide the defective nature of its products and prevent Plaintiff and the Class from learning the truth or inquiring further, Defendants engaged in active deception, concealment, and other inequitable conduct described herein.  As a result, any and all applicable statutes of limitations have been tolled.

## COUNT ONE
### Breach of Express Warranties by Affirmation, Promise, Description, Sample; (Ga. Code Ann. § 11-2-313)

82.    Plaintiff incorporates the forgoing allegations as if fully set forth herein.

83.    Defendants are and at all times have been a "merchant" with respect to Synthetic Turf Fields under Ga. Code Ann. § 11-2-104(1) and a "seller" of Synthetic Turf Fields under Ga. Code Ann. § 11-2-103(1)(d).

84.    Synthetic Turf Fields are and were at all relevant times "goods" within the meaning of Ga. Code Ann. § 11-2-105(1).

85.    In connection with the purchase or sale of each Synthetic Turf Field, Defendants provided an express warranty for a period of 8 years from the date of first use to consumers.

86.    Defendants warranted that if their Synthetic Turf Fields "prove[d] to be defective in material or workmanship, resulting in premature wear, during normal and ordinary use of the Product . . . FieldTurf will . . . either repair or replace the affected area without charge . . . ."

87.    Among other express warranties, Defendants expressly warranted that their Synthetic Turf Fields were made with high quality materials that would deliver unmatched durability, would not prematurely deteriorate, and would stand up like natural grass.  Defendants further warranted that "the length of time for which a Prestige field can be used is just about unlimited . . . ." and that "[w]ith manufacturing in our own plants carefully controlled, our ongoing policies ensure only the highest quality, approved materials from our suppliers."

88.    Defendants' warranties formed a basis of the bargain that was reached when Plaintiff and Class Members purchased their Synthetic Turf Fields.

89.    Defendants breached their express warranties by (1) providing Plaintiff with Synthetic Turf Fields that were defective in material and (2) not repairing or replacing the affected Synthetic Turf Fields free of charge.  Specifically, Defendants provided Plaintiff and Class members with Synthetic Turf Fields that contained manufacturing defects that led to premature deterioration, wear, and matting.  Rather than honoring their warranties, Defendants concealed this known defect in their Synthetic Turf

Fields and did not repair or replace the affected fields free of charge. Instead, Defendants blamed improper field maintenance for the premature deterioration and matting Plaintiff experienced and told Plaintiff to purchase supplemental equipment in order to better maintain the Synthetic Turf Fields.

90.     Plaintiff first contacted Defendants approximately six months after its Synthetic Turf Field was installed to complain about premature wear and matting. Rather than attempting to cure their breach as provided by the warranty, Defendants told Plaintiff it needed to purchase a specialized broom for $700.00 in order to keep the grass fibers standing up and not prematurely matting down.

91.     Plaintiff again put Defendants on notice in 2010 that the Synthetic Turf Field it purchased appeared to be deteriorating and matting, and yet again Defendants failed to honor their warranties. Instead, Defendants blamed the problems on maintenance and grooming issues.

92.     As a direct and proximate result of Defendants' breach of express warranties, Plaintiff and the Class Members have been damaged in an amount to be determined at trial.

## COUNT TWO
### Breach of Implied Warranty of Merchantability
### (Ga. Code Ann. § 11-2-314)

93.     Plaintiff incorporates the forgoing allegations as if fully set forth herein.

94.     Defendants are and at all times have been a "merchant" with respect to Synthetic Turf Fields under Ga. Code Ann. § 11-2-104(1) and a "seller" of Synthetic Turf Fields under Ga. Code Ann. § 11-2-103(1)(d).

27

95.    Synthetic Turf Fields are and were at all relevant times "goods" within the meaning of Ga. Code Ann. § 11-2-105(1).

96.    A warranty that Synthetic Turf Fields are in merchantable condition and fit for the ordinary purpose for which artificial turf fields are used is implied by law pursuant to Ga. Code Ann. § 11-2-314.

97.    Defendants' Synthetic Turf Fields, when sold and at all times thereafter, were not in merchantable condition and were not fit for the ordinary purpose for use as an artificial turf field.  Specifically, Defendants' Synthetic Turf Fields were inherently defective because the synthetic grass fibers were made with a different chemical composition than had been promised and advertised, which made the fibers particularly susceptible to UV radiation.  This susceptibility was contrary to Defendants' sales promises that the Synthetic Turf Fields were far more durable than any other product on the market, would stand up like natural grass, and would not prematurely deteriorate.

98. This rendered Plaintiff's and the Class's Synthetic Turf Fields inherently defective and unfit fit for the purpose and duration for which the Synthetic Turf Fields were marketed and sold as at the time of purchase.

99.    As alleged herein, Plaintiff notified Defendants that there were issues with its Synthetic Turf Field, contacting them about deterioration and matting appearing approximately six months after purchase and again in 2010.

100.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

## COUNT THREE
### Willful Misrepresentation of a Material Fact
### (Ga. Code Ann. § 51-6-2)

101. Plaintiff incorporates the forgoing allegations as if fully set forth herein.

102. Ga. Code Ann. § 51-6-2(a) states that "[w]illful misrepresentation of a material fact, made to induce another to act, upon which such person acts to his injury, will give him a right of action."

103. As alleged and described herein, Defendants knowingly made false representations of material facts regarding the quality and durability of their Synthetic Turf Fields to Plaintiff.

104. Defendants knew that the representations they made concerning the quality and durability of their Synthetic Turf Fields were false and misleading as early as 2006.

105. Despite this knowledge, Defendants did not alter their marketing campaigns or sales materials and continued to make false and misleading representations of material fact concerning the intrinsic quality and durability of their Synthetic Turf Fields, including to Plaintiff.

106. As alleged and described herein, Defendants' sales representatives made false representations to Plaintiff when selling Plaintiff a Synthetic Turf Field. Among other things, Defendants' sales representatives made the following false representations:

    a. That if Defendants' Synthetic Turf Fields was durable enough to withstand use by NFL football players without deteriorating and matting, then it would certainly withstand any wear and tear that animals at the pet resort would have on it;

b.   That the Synthetic Turf Field would stand up like natural grass and would not succumb to premature deterioration, wear, or matting;

c.   That the Synthetic Turf Field had "unmatched memory and resistance to matting;"

d.   That the chemical composition of their Synthetic Turf fibers were twice as resistant to UV damage than that of other fibers;

e.   That the length of time for which the Synthetic Turf Field could be used was "just about unlimited;" and

f.   That Defendants' manufacturing process ensured "only the highest quality, approved materials" were being used in the manufacturing of the Synthetic Turf Fields.

107.   Defendants' false representations were intended to induce Plaintiffs into purchasing one of their Synthetic Turf Fields.  Defendants were aware that Plaintiff was looking for a Synthetic Turf Field whose blades of grass would stand up like natural grass and would not prematurely deteriorate or succumb to matting, which is precisely what Defendants represented their Synthetic Turf Field would do.

108.   At the time Defendants knowingly made these false representations, Plaintiff and the Class were unaware of the falsity of Defendants' statements.  Having no reason to question Defendants' veracity, and having no reasonable ability to uncover the existence of the defect, Plaintiff reasonably, justifiably, and foreseeably took Defendants at their word that the quality and durability of their Synthetic Turf Fields would meet its needs.

109.   Plaintiff exercised reasonable and ordinary diligence in attempting to discover the truth concerning the quality of Defendants' Synthetic Turf Fields by asking Defendants' sales representative questions about whether their Synthetic Turf Fields would stand up like natural grass and would be durable enough to withstand frequent animal use without prematurely deteriorating.

110.   Plaintiff could not have been expected to discover the true intrinsic quality of Defendants' Synthetic Turf Fields absent chemical testing of the Synthetic Turf, which is beyond reasonable inquiry.  Plaintiff's reliance on Defendants' false representations was therefore reasonable.

111.   As a direct and proximate result of Defendants' false misrepresentations, Plaintiff and the Class have suffered injury-in-fact and/or actual damages in an amount to be proven at trial.  Had Plaintiff and the Class been aware of these falsities, they would not have purchased Defendants' Synthetic Turf Fields, or would have paid less for them.

**COUNT FOUR**
**Suppression of Material Fact**
**(Ga. Code Ann. § 23-2-53)**

112.   Plaintiff incorporates the forgoing allegations as if fully set forth herein.

113.   Ga. Code Ann. § 23-2-53 states that "[s]uppression of a material fact which a party is under an obligation to communicate constitutes fraud.  The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case."

114.   Based on the facts of this case, Defendants were under a duty to communicate the true quality and durability of their Synthetic Turf Fields to Plaintiffs.

115.    Plaintiff made multiple inquiries to Defendant regarding the durability of Defendants' Synthetic Turf Fields, whether their Synthetic Turf Fields would stand up like natural grass, and what the expected lifespan of their product would be.

116.    Despite Plaintiff's direct inquiries, Defendants failed to disclose material facts concerning the defects in their Synthetic Turf Fields which caused premature wear, deterioration, and matting.

117.    Defendants were aware as early as 2006 that their Synthetic Turf Fields contained defects which were causing their Synthetic Turf Fields to prematurely deteriorate and mat.  Despite this knowledge, Defendants did not disclose the existence of this defect to consumers—even when directly asked about such pertinent qualities—and omitted any reference to such defects from marketing materials and sales representations.

118.    Defendants' sales representatives suppressed material facts from Plaintiff by failing to disclose the existence of a material defect which led to premature deterioration, wear, and matting on the fields;

119.    Defendants' suppression of these material facts were intended to induce Plaintiffs into purchasing one of their Synthetic Turf Fields.  Defendants were aware that Plaintiff was looking for a Synthetic Turf Field whose blades of grass would stand up like natural grass and would not prematurely deteriorate or succumb to matting.  By suppressing material facts which would lead a reasonable consumer to conclude that the defects present in Defendants' Synthetic Turf Fields would defeat Plaintiff's purpose in purchasing a Synthetic Turf Field, Defendants intended to induce Plaintiff into purchasing a Synthetic Turf Field.

120.    Had Plaintiff and the Class been alerted to these material facts, they would not have purchased Defendants' Synthetic Turf Fields, or would have paid less for them.

121.    At the time Defendants suppressed this material information, Plaintiff was unaware of Defendants' omissions.  Having no reason to question Defendants' veracity, Plaintiff reasonably, justifiably, and foreseeably relied upon Defendants representations that the quality and durability of their Synthetic Turf Fields would meet its needs.

122.    Plaintiff exercised ordinary diligence in attempting to discover the truth concerning the quality of Defendants' Synthetic Turf Fields by asking Defendants' sales representative whether their Synthetic Turf Fields would stand up like natural grass and would be durable enough to withstand frequent animal use without prematurely deteriorating.

123.    Plaintiff could not have been expected to discover the true intrinsic quality of Defendants' Synthetic Turf Fields absent chemical testing of the Synthetic Turf fibers, which is beyond reasonable inquiry.   Plaintiff's reliance on Defendants' false representations was therefore reasonable.

124.    As a direct and proximate result of Defendants' false misrepresentations, Plaintiff and the Class have suffered injury-in-fact and/or actual damages in an amount to be proven at trial.

**COUNT FIVE**
**Common Law Fraud**
**(Under Georgia Law)**

125.    Plaintiff incorporates the forgoing allegations as if fully set forth herein.

126.    Defendants knowingly made false representations and omitted material facts regarding the quality and durability of their Synthetic Turf Fields when claiming that the fields were made with unmatched durability, were twice as UV resistant as other Synthetic Turf fibers, and would not succumb to premature wear, deterioration, or matting, and continued to conceal the intrinsic qualities of their Synthetic Turf Fields from Plaintiff.

127.    Defendants knew that the representations concerning the quality and durability of their Synthetic Turf Fields were false and misleading as early as 2006, as evidenced by email discussions concerning Defendants' use of overblown marketing representations.

128.    Despite this knowledge, Defendants made false representations and omissions of material fact concerning the intrinsic quality and durability of their Synthetic Turf Fields and made these representations in 2007 when selling Plaintiff his Synthetic Turf Field.

129.    Defendants' statements were intended to induce Plaintiffs into relying on their representations.  Defendants were aware that Plaintiff was looking for a Synthetic Turf Field whose blades of grass would stand up like natural grass and would not prematurely deteriorate or succumb to matting, which is precisely what Defendants claimed their Synthetic Turf Field would do.

130.    At the time Defendants knowingly made these false representations and material omissions, Plaintiff and the Class were unaware of the falsity of Defendants' statements.  Having no reason to question Defendants' veracity, Plaintiff and the Class

reasonably, justifiably, and foreseeably relied on Defendants' representations concerning the quality and durability of their Synthetic Turf Fields when purchasing Defendants' product.

131.    Plaintiff exercised ordinary diligence in attempting to discover the truth concerning the quality of Defendants' Synthetic Turf Fields by asking Defendants' sales representative whether their Synthetic Turf Fields would stand up like natural grass and would be durable enough to withstand frequent animal use without prematurely deteriorating.

132.    Plaintiff could not have been expected to discover the true intrinsic quality of Defendants' Synthetic Turf Fields absent chemical testing of the Synthetic Turf fibers, which is beyond reasonable inquiry.    Plaintiff's reliance on Defendants' false representations was therefore reasonable.

133.    Plaintiff expected to receive a Synthetic Turf Field free from any manufacturing defects and would not have purchased Defendants' Synthetic Turf Field, or paid substantially less money for their Synthetic Turf Field, had they known of the defects in the Defendants' Synthetic Turf Fields.

134.    As a direct and proximate result of Defendants' fraudulent concealment, Plaintiff and the Class have suffered injury-in-fact and/or actual damages in an amount to be proven at trial.  Had Plaintiff and the Class been aware of these falsities, they would not have purchased Defendants' Synthetic Turf Fields, or would have paid less for them.

## COUNT SIX
## Negligent Misrepresentation
## (Under Georgia Law)

135.    Plaintiff incorporates the forgoing allegations as if fully set forth herein.

136.    Defendants negligently supplied Plaintiff and the Class with false information on material facts when stating, among other things, that their Synthetic Turf Fields were made with unmatched durability, were better able to stand up than traditional turf fields and would not prematurely deteriorate, wear, or mat.

137.    Defendants made such representations without regard to their truth or falsity and thereby failed to use reasonable care in communicating the true quality and nature of their Synthetic Turf Fields to Plaintiff and the Class.

138.    Given the facts available to Plaintiff and Class members at the time of purchase, Plaintiff and the Class reasonably relied on the information given to them by Defendants.

139.    As a direct and proximate result of relying on Defendants' negligent misrepresentations, Plaintiff and Class members suffered injury in fact and/or actual damages in an amount to be determined at trial.  In relying on Defendants' negligent misrepresentations regarding the quality of their Synthetic Turf Fields, Plaintiff and the Class suffered economic harm, as they would not have purchased Defendants' Synthetic Turf Fields, or would have paid less for them, had they known about these misrepresentations prior to purchase.

140.    Plaintiff, on behalf of itself and all others similarly situated, demands judgment against Defendants for damages in an amount to be determined at trial.

## COUNT SEVEN
### Violation of the Minnesota Prevention of Consumer Fraud Act
### (Minn. Stat. § 325f.69, *et seq.*)

141.    Plaintiff incorporates the forgoing allegations as if fully set forth herein.

142.    Defendants' Synthetic Turf Fields constitute "merchandise" within the meaning of Minn. Stat. § 325F.68(2).

143.    The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby."  Minn. Stat. § 325F.69(1).  Defendants participated in misleading, false, or deceptive acts that violated the Minnesota CFA.

144.    In the course of their business, Defendants made material misstatements of fact regarding the quality and durability of their Synthetic Turf Fields when claiming that the fields were made with unmatched durability and would not succumb to premature wear, deterioration, or matting.  Moreover, Defendants knew that the representations they were making concerning the quality and durability of their Synthetic Turf Fields were false.  As shown through the various email exchanges dating as far back as 2006, Defendants were aware that their Synthetic Turf Fields were of a lower quality than promised and were subject to premature deterioration, matting, and wear.

145.    Despite this knowledge, Defendants continued to make false and misleading representations about their Synthetic Turf Fields.  At the time Defendants

37

made these misrepresentations and omissions, Plaintiff and the Class were unaware of the falsity of these misrepresentations and reasonably and foreseeably believed Defendants' representations to be true.  Had Plaintiff and the Class been aware of these misrepresentations, they would not have purchased Defendants' Synthetic Turf Fields, or would have paid less for them.

146.    In making these misrepresentations, Defendants intended to induce Plaintiff and the Class into relying on those representations.

147.    Plaintiff and Class members did in fact rely upon Defendants' representations.

148.    Defendants' material omissions also constitute deceptive conduct that violates Minn. Stat. § 325F.69.  Specifically, at the time of purchase, Defendants omitted the following facts from Plaintiff and the Class:

a.    That reports of premature field deterioration within a year had been reported; and

b.    That email discussions about the overblown marketing promises could not be achieved in the real world.

149.    These omitted facts were material in that a reasonable consumer would not have purchased Defendants' Synthetic Turf Fields, or would have paid less for it, had they known about its defects prior to purchase.

150.    Defendant intended that Plaintiff and the Class rely upon the omissions they made in connection with the sale of their Synthetic Turf Fields, in violation of Minn. Stat. § 325F.69.

151.    Defendants' unlawful acts and practices complained of herein affect the public interest.   As a direct and proximate result of Defendants' violations of the Minnesota CFA, Plaintiff and the Class have suffered injury-in-fact and/or actual damage.

152.    Pursuant to Minn. Stat. § 8.31(3a), Plaintiff and the Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

153.    Plaintiff and the Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota DTPA.  This action will achieve a public benefit.  The misrepresentations made by Defendants were significant and directly contributed to the harm suffered by Plaintiff and the Class insofar as the misrepresentations were made to increase profits at the expense of Plaintiff and the Class.

## COUNT EIGHT
### Violations of the Minnesota Unlawful Trade Practices Act
### (Minn. Stat. § 325D.13)

154.    Plaintiff incorporates the forgoing allegations as if fully set forth herein.

155.    Minn. Stat. § 325D.13 provides: "No person shall, in connection with the sale of merchandise, knowingly misrepresent, directly or indirectly, the true quality, ingredients or origin of such merchandise."

156.    Defendants are a "person" within the meaning of Minn. Stat. § 325D.10.

157.    Defendants' unlawful conduct and deceptive practices are alleged with particularity herein, and involve Defendants' ongoing touting of their Synthetic Turf

Fields as being designed and manufactured to avoid matting and deterioration, while knowing those claims to be false.

158.    As a result of Defendants' practices described herein, Plaintiff and the Class have suffered actual damages by purchasing Synthetic Turf Fields from Defendants that they otherwise would not have purchased, or by paying more for their Synthetic Turf Fields than they otherwise would have paid.

159.    Defendants' conduct described herein constitutes a violation of Minn. Stat. § 325D.13, injuring Plaintiff and the Class and entitling them to damages and an award of attorneys' fees pursuant to Minn. Stat. § 8.31, subd. 3a.

## COUNT NINE
### Violations of the Minnesota Unlawful Trade Practices Act
### (Minn. Stat. § 325D.44)

160.    Plaintiff incorporates the forgoing allegations as if fully set forth herein.

161.    Minn. Stat. § 325D.44, subd. 1 provides:

A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:
(5) represents that goods or services have . . . characteristics, ingredients, uses, benefits . . . they do not have . . . ;
(7) represents that goods or services are of a particular standard, quality, or grade . . . if they are of another;
(9) advertises goods or services with intent not to sell them as advertised; or
(13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

162.    Defendants' material misrepresentations constitute deceptive conduct that violates Minn. Stat. § 325D.44.  Specifically, Defendants misrepresented the following

40

facts at the time of sale to Plaintiff and Class members, among other things alleged herein:

  a.   Defendants' misrepresentations that their Synthetic Turf Fields would not prematurely deteriorate;

  b.   Defendants' misrepresentations that consumers would be receiving a product of unmatched durability;

  c.   Defendants' misrepresentations that their Synthetic Turf Fields were not defective, but rather required better field maintenance with sophisticated equipment when complaints over the quality of their Synthetic Turf Fields arose; and

  d.   Defendants' misrepresentations that their Synthetic Turf Fields would last well beyond the eight year warranty period or would be repaired or replaced at no cost to the consumer.

163.   As a result of Defendants' practices described above, Plaintiff and the Class suffered actual damages by purchasing Defendants' Synthetic Turf Fields they otherwise would not have purchased, or by paying more than they otherwise would have paid, had they known about these facts prior to purchase.

164.   Because Defendants willfully engaged in such trade practices, knowing them to be deceptive, Plaintiff and the Class are entitled to recover damages and all other remedies available at law, including their costs and attorneys' fees under Minn. Stat. § 325D.45, subd. 2.

## COUNT TEN
**Unjust Enrichment**

165.    Plaintiff incorporates the forgoing allegations as if fully set forth herein.

166.    Defendants have been unjustly enriched.  Plaintiffs and the Class paid substantial sums of money to purchase a Synthetic Turf Field that would not prematurely deteriorate or mat, as advertised and warranted by Defendants.

167.    Due to the defective condition of Defendants' Synthetic Turf Fields and Defendants' fraudulent concealment of the defects from Plaintiff and the Class, Plaintiff and the Class incurred out of pocket expenses in purchasing the Synthetic Turf Fields, and also equipment to upkeep the prematurely deteriorating Synthetic Turf Fields as directed by Defendants and their agents.

168.    Defendants received substantial profits from the sale of Synthetic Turf Fields and remedial equipment that they would not have received had Defendants properly disclosed the existence of the known defects to Plaintiff and other members the Class and replaced the defective Synthetic Turf Fields.

169.    Defendants were conferred a benefit in payment from Plaintiff and the Class for which they should equitably return or compensate Plaintiffs and class members, i.e., Defendants were unjustly enriched by their improper conduct and are required to compensate Plaintiffs for Defendants' unjust enrichment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and all others similarly situated, prays for judgment against Defendants as follows:

A.    An Order certifying the Class and appointing Plaintiff as Class

Representative and his counsel as Class Counsel;

B.    An award of damages permissible by law;

C.    An award of equitable relief;

D.    An award of all other costs, disbursements, expenses, and attorneys' fees as

allowed by law;

E.    Pre- and post-judgment interest, to the maximum extent allowable by law;

and

F.    Such other and further relief as this Court deems just and proper.

<u>**JURY DEMAND**</u>

Plaintiff, on behalf of itself and all others similarly situated, hereby demands a

trial by jury as to all issues so triable.

Dated: January 27, 2017            s/ Brian C. Gudmundson
                                   Brian C. Gudmundson (MN Bar No. 0336695)
                                   Bryce D. Riddle (MN Bar No. 0398019)
                                   **ZIMMERMAN REED LLP**
                                   1100 IDS Center
                                   80 South 8th Street
                                   Minneapolis, MN 55402
                                   Telephone: (612) 341-0400
                                   Facsimile: (612) 341-0844
                                   brian.gudmundson@zimmreed.com
                                   bryce.riddle@zimmreed.com

                                   Arthur M. Murray (LA Bar No. 27694)
                                   Stephen B. Murray (LA Bar No. 0958)
                                   Jessica W. Hayes (LA Bar No. 28927)
                                   **MURRAY LAW FIRM**
                                   650 Poydras Street, Suite 2150
                                   New Orleans, Louisiana  70130

Telephone: (504) 525-8100
Facsimile:  (504) 584-5249
amurray@murray-lawfirm.com
smurray@murray-lawfirm.com
jhayes@murray-lawfirm.com

***Attorneys for Plaintiff***